# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## (ATLANTA DIVISION)

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. _____** |
| **DRIVE PLANNING, LLC, and RUSSELL TODD BURKHALTER,** | **JURY TRIAL DEMANDED** |
| **Defendants,** | |
| **and** | |
| **JACQUELINE BURKHALTER, THE BURKHALTER RANCH CORPORATION, DRIVE PROPERTIES, LLC, DRIVE GULFPORT PROPERTIES LLC, and TBR SUPPLY HOUSE, INC.,** | |
| **Relief Defendants.** | |

## **COMPLAINT**

Plaintiff, the United States Securities and Exchange Commission

("Commission" or "SEC"), alleges the following:

### I.     OVERVIEW

1.     From 2020 through at least June 2024, Defendant Russell Todd

Burkhalter ("Burkhalter") ran a Ponzi scheme through his business, Drive Planning,

LLC ("Drive Planning"), selling unregistered securities in the form of "Real Estate

Acceleration Loans" ("REAL"), which Burkhalter described in promotional materials

as a "bridge loan opportunity promising 10% in 3 months."  As of the end of June

2024, over 2,000 investors had invested more than $300,000,000 in REAL.

2.     Defendants encouraged people to tap their savings, their IRAs, and even

lines of credit, to invest in REAL.  As of early May 2024, the scheme was receiving

applications for over a million dollars every day, driven by an organization of more

than 100 sales agents.

3.     Defendants and the sales agents they trained falsely told REAL

investors that Drive Planning pooled REAL investments and loaned that money out

to property developers and/or used it to enter into joint ventures with property developers, thereby earning the profits necessary to pay returns to REAL investors.

4.      In fact, Drive Planning did not have any legitimate profitable enterprise capable of generating the sums necessary to pay the promised 10 percent returns every three months.  Instead, in classic Ponzi fashion, Burkhalter used money from new investors to pay the supposed "returns" to existing investors and to maintain a luxurious lifestyle.

5.      Emergency relief is necessary.  While Burkhalter pledged, on June 10, 2024, to cease accepting new investments in REAL, and to cease paying commissions or paying supposed returns to investors, he nevertheless paid sales commissions to Drive Planning sales agents on June 21, 2024.  Moreover, Burkhalter remains a signatory on bank accounts containing millions of dollars of investor funds and has recently entered into a divorce settlement pursuant to which he may transfer to his spouse property bought with investor funds.  There is a serious risk of dissipation of assets that could, if preserved, help fund investor redress.

6.      Given the scope and duration of this Ponzi scheme, an asset freeze and a receiver are necessary to gather, preserve and protect whatever assets still exist for the benefit of the victims of the Defendants' Ponzi scheme.

## II. VIOLATIONS

7.     The Defendants have (1) employed devices, schemes, and artifices to defraud investors in the offer and sale of securities, (2) obtained money by means of material misrepresentations and omissions, and (3) engaged in acts practices and courses of business which operate as a fraud, all in violation of Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)].

8.     The Defendants have (1) employed devices, schemes, and artifices to defraud investors in connection with the purchase and sale of securities, (2) made material misrepresentations and misleading omissions, and (3) engaged in acts, practices, and courses of business which operate as a fraud, all in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and subsections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

9.     Defendant Burkhalter is also liable as a control person of Drive Planning under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for its violations of Exchange Act Section 10(b) and Rules 10b-5(a), (b), and (c).

## III. JURISDICTION AND VENUE

10.     The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the

Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this complaint, and transactions, acts, practices, and courses of business of similar purport and object, for disgorgement plus prejudgment interest, for civil penalties, for an officer and director bar against Burkhalter, and for other equitable relief.

11.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and 28 U.S.C. § 1331.

12.     Defendants, directly and indirectly, made use of the mails, and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

13.     Certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act and the Exchange Act occurred in the Northern District of Georgia.  In addition, Defendant Burkhalter resides (at least part-time) in this judicial district, Defendant Drive Planning maintains its principal place of business in this judicial district, and certain REAL investors reside in this judicial district.

14.     Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this

complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

## IV. THE DEFENDANTS

15.     **Russell Todd Burkhalter**, age 52, is a resident of St. Petersburg, Florida.  Burkhalter is the sole owner of Drive Planning which he alone controls and which he operates from offices in Alpharetta, Georgia.  He formerly held a Series 65 securities license and has been licensed in Georgia as a resident insurance agent since 1997.

16.     **Drive Planning, LLC** is a Georgia limited liability company. Burkhalter formed Drive Planning in 2015, listing himself as organizer and registered agent, and listing offices in Johns Creek (Fulton County), Georgia.  At all times relevant to this case, Burkhalter had actual control over Drive Planning's assets and operations, and ultimate control over the use and disposition of investor funds.  In short, Drive Planning is the alter ego of Burkhalter.  The most recent annual registration lists offices at 8000 Avalon Boulevard in Alpharetta, Georgia.

## V.     RELIEF DEFENDANTS

17.     **Jacqueline Burkhalter** is a resident of Blue Ridge, Fannin County, Georgia, in this judicial district.  She was Burkhalter's wife while Burkhalter operated his Ponzi scheme.

18.     **The Burkhalter Ranch Corporation** ("Burkhalter Ranch") is a Georgia corporation incorporated on August 21, 2021. Burkhalter Ranch has its principal office in Mineral Bluff, Georgia, in this judicial district. Defendant Burkhalter is the Chief Executive Officer and Relief Defendant Jacqueline Burkhalter is listed as its Chief Financial Officer and Corporate Secretary.

19.     **Drive Properties, LLC** ("Drive Properties") is a Georgia limited liability company formed on January 8, 2019, with its principal place of business in Alpharetta, Georgia, in the same office as Defendant Drive Planning. Relief Defendant Jacqueline Burkhalter is the registered agent for service of process and listed as the company's Organizer.

20.     **TBR Supply House, Inc.** ("TBR") is a Georgia corporation formed on January 17, 2022, with its principal place of business in Mineral Bluff, Georgia. Relief Defendant Jacqueline Burkhalter is the registered agent for service of process and listed as the company's CEO, CFO, and Corporate Secretary.

21.     **Drive Gulfport Properties, LLC** ("Drive Gulfport") is a Florida limited liability company formed on December 9, 2019, with its principal place of business in St. Petersburg, Florida. Relief Defendant Jacqueline Burkhalter is the registered agent for service of process and listed as the company's Manager.

## VI.  FACTS

### The Ponzi Scheme Begins

22.     In 2020, Burkhalter began offering to the public what he described in promotional materials as a "bridge loan opportunity promising 10% in 3 months." Burkhalter named the investment vehicle "REAL" (an acronym for "Real Estate Acceleration Loan").

23.     Defendants produced and gave to potential investors promotional materials, including a large-font three-page color brochure (the "REAL brochure") that described REAL in four bullet points:

- 3-month term;

- 10% return;

- Quitclaim deed collateral; and

- $20,000 minimum.

24.     Investments in REAL were and are "securities," as defined by federal securities law.

25.     Defendants offered the REAL investments for sale nationwide and accepted investments from international investors.

26.     Defendants distributed the REAL brochure to prospective investors through the U.S. mail, by emailing it as a Portable Document Format (PDF), by

8

reproducing it on the Drive Planning website (www.driveplanning.com), by handing it directly to prospective investors during in-person sales presentations, and by making hard copies available to Drive Planning's sales agents.

27.     Another bulleted list on the REAL brochure represented:

- If you have $20,000 you can participate;

- You can use money from your retirement account;

- You don't have to be an accredited investor;

- You can use money from savings;

- You can use money from a line of credit; and

- You do not need to be a U.S. citizen.

28.     Burkhalter and the sales agents he recruited to sell REAL represented to prospective investors that Drive Planning would pool their money and loan it out to property developers, and/or enter into joint ventures with property developers, and thereby generate the profit necessary to meet obligations to REAL investors.

29.     But the interest from property developers in doing business with Drive Planning proved insufficient, and Drive Planning had no other profit-generating enterprises sufficient to meet obligations to REAL investors, each of whom expected a ten percent return every 90 days.

*A Scheme to Defraud from Day One*

30.     Analysis of Drive Planning bank records indicates that the first investment in REAL occurred on September 22, 2020.

31.     On that date, Drive Planning received and deposited a check for $50,000 from the first REAL investor into a Drive Planning bank account at Truist Bank, which had a beginning balance of $90,665.  From September 22, 2020, to October 13, 2020, the account only received one additional deposit in the amount of $6.

32.     On October 13, 2020, Drive Planning transferred $112,000 out of that account to a self-directed IRA.  Of this total, $90,671 in funds (the beginning Truist balance and the $6 deposit) were unrelated to REAL investments.  This means that the self-directed IRA transfer included at least $21,329 of REAL investment funds.

33.     The self-directed IRA that received the $112,000 transfer, including funds from the first REAL investor, was for the benefit of an individual who had invested in a previous "energy" investment offered by Drive Planning.  The terms of that investment called for principal and fixed return to be paid in October 2020.

34.     The following chart shows the above-described flow of money:

| Drive Planning Truist Account xx2951 | | | | | | |
|---|---|---|---|---|---|---|
| Summary of First Investment Use | | | | | | |
| From September 22, 2020 to October 13, 2020 | | | | | | |
| | | | | | | |
| First REAL Investment 9/22/20 | $ | 50,000 | | | | |
| Total Investor Deposits | | 50,000 | | Payment to Self-Directed IRA | $ | 112,000 |
| | | | | Less: Other Deposits | | (90,671) |
| Beginning Balance | | 90,665 | | **REAL Investment Funds Used** | **$** | **21,329** |
| Other Deposits | | 6 | | | | |
| Total Other Deposits | $ | 90,671 | | | | |

35.     Likewise, Burkhalter used funds from the second and third investors in REAL for his personal benefit and not for bridge loans to property developers or joint ventures with property developers.

36.     The second investor in REAL wired $30,000 into the Drive Planning bank account at Truist on October 14, 2020. The third investor wired in $150,000 on the same day. At the time, the balance of the account was $11,689. From October 14 to November 16, 2020, the account received $1,500 in additional deposits.

37.     On October 19, 2020, Burkhalter paid $40,000 to Atlantic RV Centers LLC.

38.     From October 14 to November 16, 2020, Burkhalter spent another $11,029 from the Drive Planning Truist bank account for additional RV-related expenses.

39.     Then, on November 16, 2020, Burkhalter sent a wire out of the Drive Planning Truist bank account for $42,518 to the law firm of Kessler & Solomiany, LLC.

40.     Kessler & Solomiany represented Burkhalter's ex-wife.

41.     The following chart shows the above-described flow of money from the second and third REAL investors and shows that Burkhalter used $80,358 from those investors for personal expenses, and not for bridge loans to property developers or joint ventures with property developers:

| Drive Planning Truist Account xx2951 | | | | | |
|---|---|---|---|---|---|
| From October 14, 2020 to November 16, 2020 | | | | | |
| Second REAL Investment | $ | 30,000 | | Atlantic RV Centers LLC | $ | 40,000 |
| Third REAL Investment | | 150,000 | | Other RV Expenses | | 11,029 |
| Total Investor Deposits | | 180,000 | | Kessler & Solomiany LLC ▮▮▮▮ | | 42,518 |
| | | | | Non-Real Estate Expenses | | 93,547 |
| | | | | | | |
| Beginning Balance | | 11,689 | | Non-Real Estate Expenses | | 93,547 |
| Other Deposits | | 1,500 | | Less: Other Deposits | | (13,189) |
| Total Other Deposits | $ | 13,189 | | **REAL Investment Funds Used** | $ | **80,358** |

### *Expanding the Scheme with Sales Agents and Sales Incentives*

42.     Beyond the REAL brochure and other website content, Defendants increased the inflow of cash from REAL investors by recruiting and paying sales agents, identified as "financial consultants" on the Drive Planning website.

43.     Defendants paid sales agents a four percent commission on each REAL investment he or she sold, including on amounts that investors chose to "rollover" into a new 90-day investment.

44.     Defendants conducted frequent training seminars for Drive Planning sales agents but did not directly disclose to all agents that Drive Planning did not have a profit generating enterprise sufficient to meet obligations to REAL investors and sales agents.

45.     Defendants further motivated sales agents by creating two clubs for top sales performers: The Presidents Club and the Chairman's Council.  Entry into the clubs required selling a certain amount of Drive Planning products, including REAL.

46.     Sales of $2,500,000 entitled the sales agent to membership in the President's Club.

47.     Sales of $4,500,000 entitled the sales agent to membership in the Chairman's Council.

48.     Membership in each group entitled the sales agent to an all-expense-paid trip for two to destinations including Toronto, Cabo San Lucas, and the Greek Isles.

49.     Defendants' sales plan worked.  Drive Planning's master spreadsheet ("Spreadsheet"), on which it tracked investments, withdrawals, and other information, shows that, through May 6, 2024, Defendants raised more than $336 million from more than 2,000 investors in at least 48 U.S. states, as well as other countries, with $66.9 million of that amount coming from retirement accounts.

50.     The above-referenced Spreadsheet was the only tool by which Drive Planning kept track of REAL investments.  Drive Planning did not use accounting software, nor did it keep typical financial or accounting records.

51.     According to the Spreadsheet, Drive Planning paid $131 million of purported returns to investors.  Based on the Spreadsheet, Drive Planning owes REAL investors $287,000,000, as of May 6, 2024.  The available bank records approximately match these values, showing Defendants raised $372 million from investors and repaid investors $154.9 million from September 2020 through June 2024.

52.     Bank records show that Drive Planning transferred $65 million to Automatic Data Processing, Inc. ("ADP"), Drive Planning's payroll processor.

53.     While Drive Planning did have a few W2 employees whose salaries may be included in that figure, the vast majority of that amount was commission payments to sales agents.

54.     Because Drive Planning received only $17.6 million from sources

other than REAL investors, at least $47.4 million of the above-mentioned $65 million in transfers to ADP must have been sourced from investor funds.

55.     For one recent two-week period, Drive Planning paid sales commissions of $1.92 million.

### Preserving Capital for the Scheme Through Rollovers

56.     Drive Planning furthered the scam by prompting investors to rollover their REAL investments, including the supposed 10 percent return, at the end of the three-month term.

57.     Drive Planning did so by sending an email to investors at about day 60 of the 90-day term, asking whether investors wanted to make a withdrawal, rollover the supposed balance into a new 90-day investment, or add additional funds to the rollover investment.

58.     In connection with solicitation of an election to withdraw or roll over the investment, Drive Planning never disclosed that any withdrawal would necessarily be sourced by, not a profit, but the principal invested by a later REAL investor, nor that any interest credited was a phantom number and not the product of profitable use of the investors' funds.

59.     Drive Planning received $8.8 million in REAL investments in 2021, $63.2 million in 2022, $163.1 million in 2023, and $100.3 million in 2024 (through early May 2024).

### *No Viable Engine for Generating the Supposed 10 Percent Return*

60.     Bank records reveal that, contrary to what it represented to investors and prospective investors, Drive Planning was not deploying the cash from REAL investments into bridge loans to developers or joint ventures with developers.

61.     Unbeknownst to investors, Drive Planning did not receive substantial income from loans to or joint ventures with property developers.  Rather, Drive Planning's revenue sources were limited to commissions earned on life insurance sales, membership fees (ranging from $2,000 to $5,000) from clients who received financial planning services, and rental income from a few properties.

62.     From September 1, 2020, to June 2024, Drive Planning's main accounts received deposits of $389.6 million.  Of these deposits, at least $372 million (95.4%) were received from investors in the REAL program.  During this same period, Drive Planning only received funds totaling $17.6 million from other sources, with $4 million of that from other investment programs Drive Planning was running.

### *Ponzi Payments*

63.     Based on the bank records, from September 1, 2020, to June 2024,

investors received "returns" of $154.9 million. With $372 million of REAL investor funds but only $17.6 million of potential non-REAL investor funds available, at least approximately $137.2 million of the "returns" were Ponzi payments, sourced from investor funds.

| Summary | | | | | |
|---|---|---|---|---|---|
| **Deposits** | | | | **Ponzi Analysis** | |
| Total Deposits | $ 389,665,393 | | | Non-Investor Deposits | $ 17,642,625 |
| Less: Investor Deposits | (372,022,769) | | | Less: Investor Repayments | (154,918,462) |
| Non-Investor Deposits | $ 17,642,625 | | | (Investor-Funded Repayments) | $ (137,275,837) |

64.     Without new investor funds, Drive Planning would not have been able to meet its repayment obligations. For example, in May of 2022, Drive Planning received investor deposits of $3.3 million and non-investor deposits of $41,311 yet paid out $518,874 to investors.

65.     In September of 2023, Drive Planning accounts received investor deposits of $16.8 million and non-investor deposits of $270,104 yet paid out $7.1 million to investors.

66.     Since September of 2021, Drive Planning does not appear to have been able to generate enough non-investor funds to repay investors. Based on its purported collateral and historical cash flows, it does not appear that Drive Planning will be able to generate future revenue sufficient to pay its investors.

### *Spending Other People's Money*

67.     In addition to misusing investor money for Ponzi payments, Burkhalter misappropriated millions of dollars of investor funds to acquire and

maintain a wealthy lifestyle.  Some examples of Burkhalter's misappropriation follow.

68.     On October 20, 2023, Drive Planning transferred $3.1 million from Drive Planning's JPMorgan account to MarineMax for the purchase of a yacht called "Stillwater".  At least $2 million of this payment came from investor funds.

69.     Purchase documents received from MarineMax show that Burkhalter purchased the yacht for himself.

70.     The MarineMax documents state that the yacht will be titled under Burkhalter's name and that, while Drive Planning would provide the payment, it "will hold no claim or interest" in the yacht, now renamed "Live More."

71.     Below is a listing photo for the yacht taken prior to Burkhalter's purchase.



72.     From September 2020 to June 2024, Drive Planning and Burkhalter spent additional large sums of investor funds on expenses that are not consistent with the real estate deals represented to investors in the REAL program.

73.     Because the funds to make these purchases came from Drive Planning accounts that primarily held investor funds, Defendants must have used investor funds to make these purchases.

74.     For example, Drive Planning and Burkhalter spent $319,628 on clothing, jewelry, and beauty treatments.  They spent $69,293 at Diamonds Direct, $75,785 at Louis Vuitton, and $7,777 at Drip IV, a beauty and wellness company located in St. Petersburg, Florida.

75.     Defendants also spent considerable funds on luxury travel and vacations, including least $4.6 million on chartering private jets and luxury car services, at least $183,871 on hotels and resorts (including $15,404 to Norwegian Cruise Line, $12,750 to Access Italy, an Italian travel company, and $8,738 to Expedia.com).

76.     Drive Planning and Burkhalter used $1.3 million to repay investors in Drive Planning's other investment programs.

77.     Defendants spent at least $749,243 on automobile related expenses, including at least $92,127 to a Jaguar Land Rover dealer, $243,414 to Crown Automotive in St. Petersburg, Florida, and another $67,006 to Carvana.

78.     From May 24, 2021, through December 2023, Drive Planning transferred $1.9 million to Coinbase.  Starting in April 2023, Drive Planning received $1.2 million back from Coinbase, for a net of $732,966 transferred to Coinbase.  Burkhalter also used investor funds to buy a ranch in Mineral Bluff (Fannin County), Georgia.

79.     On this property, Burkhalter used investor funds to build a large barn (the "Staurolite Barn") in Mineral Bluff, Georgia, which he rents out as an event venue.

80.     Burkhalter used investor funds to buy a clothing business in Blue Ridge, Georgia.  Relief Defendant TBR Supply House operates that business.

81.     Burkhalter used at least $2 million in investor funds to buy a luxury condo in Cabo San Lucas, Mexico.

82.     In March 2024, Burkhalter wired $1,145,000 of investor funds to NetJets, a private jet company.

83.     On information and belief, Burkhalter used or intends to use real estate purchased with investor funds to fund his obligations under a divorce settlement.

## Defendants' Misrepresentations and Omissions

84.     In addition to the above-described scheme to defraud, Defendants further defrauded investors through material misrepresentations and omissions made in connection with sales of REAL.

### *Investor A*

85.     For example, in 2022, Burkhalter and Drive Planning's Chief Operating Officer ("the COO"), spoke by phone to an investor in South Carolina ("Investor A"), soliciting him to invest in REAL.  During that call, Burkhalter and the COO represented that REAL would produce a guaranteed return of 10 percent for a three-month investment and that the investor's funds would be used to make bridge loans to property developers or to enter profitable joint ventures with property developers.

86.     In their conversations with Investor A, Burkhalter and the COO referred him to a list of properties that they claimed were owned by Drive Planning and would be collateral for his investment.

87.     Neither Burkhalter nor the COO disclosed that Investor A's investment would or could be used to make principal or interest payments to other investors.

88.     Neither Burkhalter nor the COO told Investor A that his money would or could be used to fund personal purchases by Drive Planning's principals.

89.     In reliance on the above representations and in ignorance of the above omissions, Investor A invested $45,000 in REAL in 2022.  Encouraged by what he thought were profits on that first investment, he invested another $100,000 in REAL in 2024.

### *Investor B*

90.     In 2021, an investor in Georgia ("Investor B") became a client of Drive Planning, purchasing life insurance and receiving financial advice.

91.     In a phone call in July 2021, Burkhalter solicited Investor B to invest in REAL, telling him that REAL was a profit-sharing deal in which Drive Planning would provide capital to a property developer, and that profits would be split with REAL investors and used to pay the returns on the REAL investment.  Burkhalter

guaranteed returns of 10 percent for a three-month investment and told Investor B that there was an option to rollover the investment up to three times.

92.     No one from Drive Planning told Investor B that his investment could or would be used to make principal or interest payments to other investors, to fund the personal expenses of Burkhalter, or that certain properties bought by Drive Planning with investor money were not owned by Drive Planning.

93.     In reliance on the above representations and in ignorance of the above omissions, Investor B invested $100,000 in REAL in July 2021 and rolled over the investment twice before withdrawing $133,000 in what he believed was principal and interest in April 2022.

94.     Reassured by what they believe to be "returns," Investor B and his spouse invested in REAL several more times, including on November 18, 2022 ($20,000), on April 12, 2023 ($50,000), on April 14, 2023 ($100,000), on June 21, 2023 ($280,000), on June 26, 2023 ($25,000), on January 4, 2024 ($20,000), and on January 15, 2024 ($30,000).  Some of the proceeds for the above additional investments came from Investor B's Roth IRA account and his children's 529 accounts.

*Company A*

95.     On or about March 28, 2023, Burkhalter and the COO visited the New Jersey offices of a financial and insurance consulting firm ("Company A").

96.     During that visit, Burkhalter and the COO promoted the REAL program, telling the principal of Company A that REAL was designed to provide bridge loans for highly profitable real estate development deals.

97.     Burkhalter and the COO represented that REAL participants would receive a ten percent rate of return every three months, and there was a choice to roll over the investment plus interest or withdraw it at the end of each three-month term.

98.     Burkhalter and the COO also said that REAL investments were protected by Drive Planning's ownership of real property pledged as collateral.

99.     Burkhalter and the COO did not disclose that REAL investments would or could be used to pay back principal or interest to earlier investors, nor that any supposed "return" could be funded by principal invested by later investors, rather than by profits from real estate deals, nor that REAL investments would or could be used to fund the personal expenses of Burkhalter and/or the COO.

100.    In reliance on the above representations and ignorance of the above omissions, Company A invested $25,000 in REAL on or about February 16, 2021.

101.    Company A rolled over the funds for five quarters before withdrawing $48,717.92.

102.    Reassured by the "return" received as promised, Company A began referring certain clients to Drive Planning for investment in REAL in exchange for commission payments to Company A of four percent for each new REAL investor.

103.    On June 4, 2024, Company A received notice from Drive Planning via email that it was halting new investments in REAL as of June 15.

104.    On June 5, 2024, the principal of Company A spoke to Burkhalter by phone and asked whether there was a potential regulatory issue with Drive Planning.

105.    Although he knew at the time that the SEC was investigating Drive Planning, Burkhalter responded that there was no regulatory issue, and that the halt in the REAL program was due to an internal audit.

### *Other Prospective REAL Investors*

106.    As they had in the above-cited specific instances, Defendants told other prospective REAL investors that Drive Planning generated the return for REAL investors through its business ventures with property developers.

107.    In fact, unbeknownst to investors, Defendants did not have a profit-generating enterprise sufficient to meet its obligations to REAL investors.

108.    As they had in the above-cited specific instances, Defendants told prospective investors in REAL that their investments were collateralized by real estate.

25

109.    In fact, REAL investors held no security interest in any real estate. Their investments were wholly unsecured.

110.    As they did in the above-cited specific examples, Defendants omitted to disclose to other prospective REAL investors that Drive Planning's revenue from other sources could not possibly meet obligations to REAL investors.

111.    As they did in the above-cited specific examples, Defendants omitted to disclose to other REAL investors that the payments they received at the end of the 90-day term of their investment were funded by principal invested by other REAL investors.

112.    As referenced above, Burkhalter represented to investors and prospective investors that Drive Planning had purchased real estate that collateralized its obligations to REAL investors.

113.    Defendants created and distributed a brochure entitled "The Drive Planning Portfolio of Real Estate Investments" ("Drive Planning Real Estate Brochure").

114.    On that brochure, Defendants represented that, "The REAL Opportunity not only has partners that we work with to offer bridge loans and profit sharing in their real estate deals, but also has the full support of the assets of Drive Planning's own Portfolio of REAL Estate Investments."

115.    That representation was false and misleading in at least two respects.

116.    First, Defendants' "bridge loans and profit sharing" deals with supposed "partners" were extremely limited.  Defendants used a miniscule share of the REAL funds for bridge loans and profit-sharing deals with partners.

117.    The Drive Planning Real Estate Brochure was also false and misleading in referring to Drive Planning's supposed "Portfolio of REAL Estate Investments."  The brochure lists 23 properties, but only a few of them are titled in the name of Drive Planning, while others are titled to Burkhalter individually.  Moreover, there is no documentation showing how any of these properties secured Drive Planning's obligations to REAL investors.

118.    Defendants misled investors by omitting to disclose Burkhalter's use of investor funds to fund his purchases of luxury goods and services.

119.    Defendants further misled investors by omitting to disclose their use of investor funds to pay commissions to Drive Planning sales agents.

120.    Defendants further misled investors by omitting to disclose their use of investor funds for other Drive Planning business expenses.

121.    Defendants further misled investors and prolonged the scheme by producing videos in which Burkhalter touted the supposed bank balances and properties that, he said, proved Drive Planning's legitimacy, when he knew that the REAL program had been a Ponzi scheme from its inception.

**Relief Defendants Received Proceeds of the Ponzi Scheme**

*Jacqueline Burkhalter*

122.   Relief Defendant Jacqueline Burkhalter was married to Burkhalter while Burkhalter operated his Ponzi scheme.

123.   Burkhalter used at least $6,603,088 in Drive Planning funds to purchase real estate titled in the names of Todd and Jacqueline Burkhalter.

124.   On June 1, 2023, Jacqueline Burkhalter filed a divorce action against Burkhalter in the Superior Court of Fannin County, Georgia.

125.   In her complaint, Jacqueline Burkhalter pled for a forensic accounting of Drive Planning so that the assets of Drive Planning could be considered in the equitable distribution of marital property.

126.   On June 3, 2024, the parties reported to the Superior Court that they had reached a settlement.

127.   In addition to the real estate, Jacqueline Burkhalter received at least $1,232,300 in additional cash transfers from Drive Planning, and another $2,122,018 in transfers from Relief Defendant The Burkhalter Ranch.

128.   Jacqueline Burkhalter does not have a legitimate claim to the above-described assets because she provided nothing of value in return for them.

28

### *Burkhalter Ranch Corporation*

129.   Relief Defendant Burkhalter Ranch Corporation received ill-gotten funds from the above-described Ponzi scheme.  Drive Planning paid at least $5.8 million to purchase properties in the Burkhalter Ranch Corporation's name.  From September 2020 through June 2024, Burkhalter Ranch received an additional $17.1 million in cash transfers from Drive Planning.

130.   Because it provided nothing of value in return for these transfers, Burkhalter Ranch does not have a legitimate claim to those assets.

### *Drive Properties*

131.   Relief Defendant Drive Properties received ill-gotten funds from the above-described Ponzi scheme.  Specifically, Drive Planning paid at least $777,000 for properties, much of which came from investor funds, and titled those properties in Drive Properties' name.

132.   Because it provided nothing of value in return for these properties, Drive Properties does not have a legitimate claim to those assets.

### *Drive Gulfport*

133.   Relief Defendant Drive Gulfport received ill-gotten funds from the above-described Ponzi scheme.  Specifically, Drive Planning paid at least $944,118

for property, much of which came from investor funds, and titled that property in Drive Gulfport's name.

134.   Because it provided nothing of value in return for that property, Drive Gulfport does not have a legitimate claim to that asset.

### *TBR*

135.   Relief Defendant TBR received ill-gotten funds from the above-described Ponzi scheme.  Specifically, TBR received $352,000 in cash transfers from Relief Defendant Burkhalter Ranch.  In addition, Drive Planning paid at least $900,000 for property, much of which came from investor funds, and titled that property in TBR's name.  Additionally, Drive Planning transferred at least an additional $12,307 in cash to TBR.

136.   Because it provided nothing of value in return for the property and cash transfers, TBR does not have a legitimate claim to those assets.

137.   In equity, Relief Defendants should disgorge the ill-gotten funds that they received, for the benefit of victims of the Ponzi scheme.

## Current State of the Scheme

138.    On June 10, 2024, Defendants represented to the SEC that they would accept no new investments in REAL, would not pay amounts due to REAL investors, and would not pay commissions to sales agents.

139.    Despite that pledge, Defendants paid sales commission on June 21, 2024.

140.    On information and belief, on July 23, 2024, Burkhalter sent an email to Drive Planning sales agents, advising that the SEC was "reviewing" the REAL investment program, and falsely suggesting that Drive Planning could get investors "their payments in a timely manner" but for the SEC's "review."

141.    In truth, as Burkhalter is aware, any such continued payments would necessarily constitute a continuation of the Ponzi scheme, with Burkhalter continuing to misrepresent payments to investors as coming from profits, rather than from money invested by others.

142.    Burkhalter still has control over the tens of millions of dollars currently in Drive Planning's bank accounts, as well as over the tens of millions of dollars' worth of real estate and other property purchased with investor funds.

## COUNT I—FRAUD

## Violations of Section 17(a)(1) of the Securities Act
## [15 U.S.C. § 77q(a)(1)]

143.    Paragraphs 1 through 142 are hereby realleged and incorporated herein by reference.

144.    Beginning in or around 2020 and continuing through the present, Defendants, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

145.    Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes, and artifices to defraud.

146.    By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II—FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

147.    Paragraphs 1 through 142 are hereby realleged and incorporated herein by reference.

148.    Beginning in or around 2020 and continuing through the present, Defendants, acting knowingly, recklessly, or negligently in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

      a.    obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      b.    engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

149.    By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III – FRAUD

### Violations of Section 10(b) of the Exchange Act and
### Sections (a), (b), and (c) of Rule 10b-5 thereunder
### [15 U.S.C. § 78j(b) and 17 C.F.R. §§ 240.10b-5(a), (b), and (c)]

150.    Paragraphs 1 through 142 are hereby re-alleged and are incorporated herein by reference.

151.    Between in or around 2020 and the present, Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

      a.    employed devices, schemes, and artifices to defraud;

      b.    made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      c.    engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

152.    Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.

34

153.    By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Sections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

## COUNT IV – CONTROL PERSON LIABILITY (FRAUD)

### Violations of Section 20(a) of the Exchange Act
### [15 U.S.C. § 78t(a)]
### (Against Burkhalter)

154.    Paragraphs 1 through 153 are realleged and incorporated by reference herein.

155.    At all times relevant hereto, Defendant Burkhalter controlled Drive Planning for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

156.    By engaging in the conduct alleged above, Defendant Burkhalter is liable as a control person for Drive Planning's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

## COUNT V – DISGORGEMENT
### (Against Relief Defendants)

157.    Paragraphs 1 through 156 are realleged and incorporated by reference herein.

158.    As alleged above, Defendants violated the federal securities laws by engaging in fraudulent activity and misappropriating substantial investor assets.

159.   Defendants, directly or indirectly, transferred funds to Relief Defendants, including by sending funds to Relief Defendants and paying for property in the name of Relief Defendants.  Relief Defendants do not have a legitimate claim to the assets Defendants transferred to them.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays for:

### I.

A temporary restraining order and preliminary and permanent injunctions enjoining the Defendants, their officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (a)(2), (a)(3)].

### II.

An order barring Burkhalter from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)][15 U.S.C. § 77t(e) and 15 U.S.C. § 78u(d)(2)].

### III.

An order requiring an accounting by Defendants of the amounts raised and the use of proceeds from the fraudulent conduct described in this Complaint and the disgorgement by Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

### IV.

An order requiring an accounting by each Relief Defendant of the amounts received from Defendants and an order that they disgorge such amounts plus prejudgment interest.

### V.

An order pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] imposing civil penalties against Defendants.

### VI.

An order freezing the assets of Defendants pending further order of the Court.

### VII.

An order freezing real estate assets of Relief Defendants and any assets derived, directly or indirectly, from amounts received from Drive Planning.

## VIII.

An order preventing Defendants from destroying or concealing documents until further order of this Court.

## IX.

An order expediting discovery.

## X.

The appointment of a Receiver to take charge of Drive Planning and its affiliates to preserve the value of the Defendants' remaining assets for the benefit of the Defendants' victims.

## XI.

An order requiring Burkhalter to surrender all passport(s) issued to him to the Clerk of Court and barring him from applying for or accepting any additional passports and barring him from traveling outside the United States pending resolution of this case on the merits.

## XII.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

## JURY TRIAL DEMAND

The Commission hereby demands a trial by jury as to all issues that may be so tried.

This 13th day of August, 2024.

Respectfully submitted,

/s/*Pat Huddleston II*
Pat Huddleston II
Senior Trial Counsel
Georgia Bar No. 373984
huddlestonp@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

Harry B. Roback
Senior Trial Counsel
Georgia Bar No. 706790
robackh@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
Tel: (404) 842-7616
Facsimile: *4048427679@fax.sec.gov*